## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| MARY McCAMBELL, Derivatively on Behalf of ANAVEX LIFE SCIENCES CORP., <br><br> Plaintiff, <br><br> v. <br><br> CHRISTOPHER U. MISSLING, ATAHNASIOS SKARPELOS, BERND METZNER, ELLIOT FAVRUS, and STEPHEN THOMAS, <br><br> Defendants, <br><br> And <br><br> ANAVEX LIFE SCIENCES CORP., <br><br> Nominal Defendant. | Civil Action: 16-2035 <br><br><br> **VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT** <br><br><br> <u>**JURY DEMANDED**</u> |

Plaintiff ("Plaintiff"), by and through her undersigned counsel, derivatively on behalf of Nominal Defendant Anavex Life Sciences Corp ("Anavex" or the "Company"), submits this Verified Shareholder Derivative Complaint (the "Complaint"), which also includes direct claims. Plaintiff's allegations are based upon her personal knowledge as to herself and her own acts, and upon information and belief, developed from the investigation and analysis by Plaintiff's counsel, including a review of publicly available information, including filings by Anavex with the U.S. Securities and Exchange Commission ("SEC"), press releases, news reports, analyst reports, publicly available filings in lawsuits, and matters of public record.

## NATURE OF THE ACTION

1.       This is a shareholder derivative action brought in the right, and for the benefit, of

Anavex against certain of its officers and directors seeking to remedy the Individual Defendants' (as defined below) breach of fiduciary duties and gross mismanagement that occurred from May 17, 2013 through the present (the "Relevant Period") and have caused substantial harm to Anavex. In addition, direct claims on behalf of Plaintiff herself are asserted.

2.      Anavex is a pharmaceutical company engaged in the development of drug candidates to treat Alzheimer's disease and potentially other central nervous system (CNS) diseases.

3.      Anavex was incorporated in the State of Nevada on January 24, 2004, originally under the name of Thrifty Printing Inc. ("Thrifty"). On January 25, 2007, Thrifty completed a merger with its wholly-owned subsidiary, Anavex Life Sciences Corp., and changed its name from Thrifty Printing Inc. to Anavex Life Sciences Corp. Anavex is presently headquartered in New York. Its shares trade on the NASDAQ under the ticker symbol "AVXL".

4.      Plaintiff alleges that throughout the Relevant Period, the Individual Defendants (defined below) breached their fiduciary duties by making false and/or misleading statements, as well as by failing to disclose material adverse facts about the Company's business, operational and compliance policies. Specifically and as more fully described herein, Defendants made false and/or misleading statements and/or failed to disclose that: (i) Anavex had used a paid stock promoter to artificially inflate the Company's share price; (ii) that there was an inter-relationship between some of the Anavex directors and the paid stock promoter; (iii) as a result of the foregoing, Anavex's public statements were materially false and misleading at all relevant times; and (iv) the Company has been damaged as a result and Defendants had wrongfully benefitted thereby.

5.      On December 29, 2015, Anavex disclosed that it had received a subpoena from

the U.S. Securities and Exchange Commission ("SEC") on December 22, 2015. Anavex stated in relevant part that "[t]he Company believes the subpoena and investigation relate to the recent unusual activity in the market for the Company's shares."

6.     On December 29, 2015 and based on this news, Anavex stock fell $0.72, or 10.24%, to close at $6.31.

7.     On December 30, 2015, Melissa Davis (on *seekingalpha.com*) published an article entitled "Anavex: A Regulatory Target Damaged By Incriminating Evidence."  Referencing the SEC formal investigation, the article stated in relevant part:

> Since its early days as a young penny-stock company, for example, Anavex has relied on The Primoris Group for publicity in spite of the firm's crowded roster of dubious microcap companies and its suspected involvement in pump-and-dump schemes.
>
> By the time that Anavex hired the firm almost a decade ago -- using 50,000 stock options to help cover the bill -- Primoris had already developed a reputation for touting the very sort of sleazy microcap stocks responsible for giving the industry such a horrible name . . . .
>
> \* \* \*
>
> With Primoris in charge of its publicity, Anavex has managed to generate some rather powerful hype of its own.
>
> Anavex owes at least some of its newfound popularity to the glowing reviews published by Kanak Kanti De, a so-called "doctor" who has developed a strong following on financial websites like *Seeking Alpha* and *The Motley Fool* (where he ranks as a senior healthcare contributor) by portraying himself as "a retired medical practitioner" with an impressive "M.D." behind his name.  Unless De rushed to pursue a second career in medicine after serving as the chairman of IndoGenic Consultancy -- a paid content provider that caters to clients seeking favorable stock coverage -- however, his credentials look somewhat inflated, to say the very least.  In the official bio that appeared on its website less than five years ago, IndoGenic described De as "a veteran college principal (retired) with a Ph.D. in English" -- not a medical doctor -- when the firm openly showcased his role as the chairman of its board.

8.      On December 30, 2015 and after this news, Anavex stock fell $0.78, or 12.42%, to close at $5.50.

9.      As a result of Defendants' breach of fiduciary duties and wrongful acts and omissions, Defendants have been able to entrench themselves in positions of power at the Company and retained their benefits and perquisites, the Company has been subjected to a putative class action for securities fraud, governmental investigation, had its reputation harmed and suffered a precipitous decline in the market value of its securities, all to significant loss and damage.

## JURISDICTION AND VENUE

10.      This Court has jurisdiction under 28 U.S.C. § 1332(a)(1).  Plaintiff and Defendants are citizens of different states and the amount in controversy exceeds $75,000, exclusive of interest and costs.  This action is not a collusive action designed to confer jurisdiction on a court of the United States that it would not otherwise have.

11.      This Court has jurisdiction over each defendant because each defendant is either a corporation that conducts business in and maintains operations in this District, or is an individual who has sufficient minimum contacts with this District so as to render the exercise of jurisdiction by the district courts permissible under traditional notions of fair play and substantial justice.

12.      Venue is proper in this Court under 28 U.S.C. §1391(b) because: (i) Anavex maintains its principal place of business in this District; (ii) one or more of the defendants either reside(s) in or maintain(s) executive offices in this District; and (iii) a substantial portion of the transactions and wrongs complained of herein, including the defendants' participation in the wrongful acts detailed herein, occurred in this District.

## THE PARTIES

4

**Plaintiff**

13.     *Plaintiff Mary McCambell* is, and was at relevant times, a shareholder of Anavex.  Plaintiff will fairly and adequately represent the interests of the shareholders in enforcing the rights of the corporation.  Plaintiff is a citizen of the State of California.

**Nominal Defendant**

14.     *Nominal Defendant* Anavex was incorporated in the State of Nevada on January 24, 2004, originally under the name of Thrifty Printing, Inc. ("Thrifty").  On January 25, 2007, Thrifty completed a merger with its wholly-owned subsidiary, Anavex Life Sciences Corp.  As a result, Thrifty changed its name from "Thrifty Printing, Inc." to "Anavex Life Sciences Corp." This name change was effected with NASDAQ on January 25, 2007 and common shares became quoted on the OTC Bulletin Board on January 25, 2007 under the new stock symbol of "AVXL".

**Individual Defendants**

15.     *Defendant Christopher U. Missling* ("Missling") is a director and has served as the Company's Chairman, Chief Executive Officer ("CEO"), President, Chief Financial Officer, Secretary, and Treasurer since July 2013.  Plaintiff is informed and believes and thereon alleges that Missling stopped serving as Chief Financial officer in October 2015.

16.     As stated in the Anavex February 13, 2015 Schedule 14 A ("DEF 14A"), Anavex deems that Missling ". . . is not independent as that term is defined by NASDAQ 5605(a)(2)."

17.     On December 29, 2015, Anavex filed its Form 10-K Annual Report with the SEC announcing the Company's financial and operating results for the quarter and fiscal year ended September 30, 2015 (the "FY 2015 10-K").  As stated in the FY 2015 Form 10-K, for the fiscal year 2015 Missling was paid a salary of $240,000, received stock awards of $1,220,000 and option awards of $1,151,309, and other annual compensation of $1,128,064.

18.     As stated in the FY 2015 Form 10-K, for the fiscal year 2014, Missling was paid a salary of $240,000, was paid a bonus of $400,000, and received option awards of $127,800.

19.     On December 29, 2014, Anavex filed its Form 10-K annual report with the SEC announcing the Company's financial and operating results for the quarter and fiscal year ended September 30, 2014 (the "FY 2014 Form 10-K").  As stated in the FY 2014 Form 10-K, for the fiscal year 2013, Missling was paid a salary of $60,000, received stock awards of $1,600,000 and option awards of $1,002,500.

20.     As stated in the Company's DEF 14A, as of September 30, 2014, Missling was the beneficial owner of 3,000,000 shares.

24.     **Defendant Athanasios Skarpelos** ("Skarpelos") is a director of the Company and served as the Company's Principal Executive Officer, Principal Financial Officer and Principal Accounting Officer at all relevant times until July 2013.

25.     As stated in the February 13, 2015 Schedule 14A ("DEF 14A"), Anavex deems that Skarpelos ". . . is not independent as that term is defined by NASDAQ 5605(a)(2)."

26.     As stated in the Company's DEF 14A, as of September 30, 2014, Skarpelos was the beneficial owner of 5,225,832 shares.

27.     **Defendant Bernd Metzner** ("Metzner") is a director of the Company since May 7, 2014.

28.     As stated in the FY 2015 Form 10-K, for the fiscal year 2015, Metzner was paid $11,500, and option awards of $35,860.

29.     As stated in the FY 2015 Form 10-K, Metzner was a member of the Audit Committee (Chairman), Corporate Governance Committee, and Compensation Committee. Avanex has agreed to pay Metzner $4,000 per quarter for performing functions on these

committees.

30.     As stated in the FY 2014 Form 10-K, for the fiscal year 2014, Metzner was paid $5,000 and option awards of $4,626.

31.     As stated in the Company's DEF 14A, as of September 30, 2014, Metzner has 150,000 securities underlying unexerciseable options.

32.     As stated in the FY 2015 Form 10-K, as of December 29, 2015, Metzner was the beneficial owner of 29,167 shares.

33.     ***Defendant Elliot Favus*** ("Favus") is a director of the Company since May 7, 2014.

34.     As stated in the FY 2015 Form 10-K, for the fiscal year 2015, Favus was paid option awards of $35,860

35.     As stated in the FY 2015 Form 10-K, Favus was a member of the Audit Committee, Corporate Governance Committee, and Compensation Committee.  Avanex has agreed to grant stock options to purchase an aggregate of 6,000 shares of common stock each calendar quarter as compensation for serving as a member on these committees.

36.     As stated in the FY 2014 Form 10-K, for the fiscal year 2014, Favus was paid option awards of $4,626.

37.     As stated in the Company's DEF 14A, as of September 30, 2014, Favus has 150,000 securities underlying unexerciseable options.

38.     As stated in the FY 2015 Form 10-K, as of December 29, 2015, Favus was the beneficial owner of 29,167shares.

39.     ***Defendant Steffen Thomas*** ("Thomas") is a director of the Company since June 15, 2015.

40.     As stated in the FY 2015 Form 10-K, for the fiscal year 2015, Thomas was paid option awards of $70,300.

41.     As stated in the FY 2015 Form 10-K, Thomas was a member of the Audit Committee.

**Non-Parties**

42.     ***Non-Party Cameron Durrant*** ("Durrant") served as a director of the Company from December 17, 2007 until September 16, 2011.

43.     ***Non-Party David Tousley*** ("Tousley") served as a director of the Company from December 17, 2007 until approximately October, 2011.

44.     ***Non-Party Harvey Lalach*** ("Lalach") was a director of the Company and served in various officer capacities including the Company's president from April 25, 2006 through approximately May 2011.

45.     As stated in the Company's DEF 14A, as of the date of that filing (February 13, 2015), Ananvex had ***no*** standing committees.  The DEF 14A stated in relevant part:

> The Board currently has no standing committees.  We believe that our Board is capable of analyzing and evaluating our financial statements and understanding internal controls and procedures for financial reporting.  The Board does not believe that it is necessary to have an audit committee at this time because management believes the functions of an audit committee can be adequately performed by the Board.  Our Board believes that is not necessary to have a standing compensation committee at this time because the functions of such committee are adequately performed by our Board.  Our Board also is of the view that it is appropriate for us not to have a standing nominating committee because our Board has performed and is expected to perform adequately the functions of a nominating committee.

46.     As of the filing date of the FY 2015 Form 10-K (December 29, 2015), Anavex had established an audit committee, compensation committee, and nominating committee

without any explanation relating to the timing or other reasons for creating these committees.

47.     Defendants listed in paragraphs 15, 24, 27, 33, 39 are collectively referred to hereinafter as the "Individual Defendants."

## CODE OF BUSINESS CONDUCT AND ETHICS

48.     As members of Anavex's Board, the Individual Defendants were held to the highest standards of honesty and integrity and charged with overseeing the Company's business practices and policies, and assuring the integrity of its financial and business records.

49.     The conduct of the Individual Defendants complained of herein involves a knowing and culpable violation of their obligations as directors and officers of Anavex, the absence of good faith on their part, and a reckless disregard for their duties to the Company and its investors that the Individual Defendants were aware posed a risk of serious injury to the Company.

## DUTIES OF THE INDIVIDUAL DEFENDANTS

50.     By reason of their positions as officers and/or directors of the Company, and because of their ability to control the business and corporate affairs of Anavex, the Individual Defendants owed Anavex and its investors the fiduciary obligations of trust, loyalty, and good faith.  The obligations required the Individual Defendants to use their utmost abilities to control and manage Anavex in an honest and lawful manner.  The Individual Defendants were and are required to act in furtherance of the best interests of Anavex and its investors.

51.     Each director of the Company owes to Anavex and its investors the fiduciary duty to exercise loyalty, good faith, and diligence in the administration of the affairs of the Company and in the use and preservation of its property and assets.  In addition, as officers and/or directors of a publicly held company, the Individual Defendants had a duty to promptly disseminate

accurate and truthful information with regard to the Company's operations, finances, and financial condition, as well as present and future business prospects, so that the market price of the Company's stock would be based on truthful and accurate information.

52.     To discharge their duties, the officers and directors of Anavex were required to exercise reasonable and prudent supervision over the management, policies, practices, and controls of the affairs of the Company.  By virtue of such duties, the officers and directors of Anavex were required to, among other things:

(a)     ensure that the Company complied with its legal obligations and requirements, including acting only within the scope of its legal authority and disseminating truthful and accurate statements to the SEC and the investing public;

(b)     conduct the affairs of the Company in an efficient, businesslike manner so as to make it possible to provide the highest quality performance of its business, to avoid wasting the Company's assets, and to maximize the value of the Company's stock;

(c)     properly and accurately guide investors and analysts as to the true financial condition of the Company at any given time, including making accurate statements about the Company's business prospects, and ensuring that the Company maintained an adequate system of financial controls such that the Company's financial reporting would be true and accurate at all times;

(d)     remain informed as to how Anavex conducted its operations, and, upon receipt of notice or information of imprudent or unsound conditions or practices, make reasonable inquiries in connection therewith, take steps to correct such conditions or practices, and make such disclosures as necessary to comply with federal and state securities laws;

(e)    ensure that the Company was operated in a diligent, honest, and prudent manner in compliance with all applicable federal, state and local laws, and rules and regulations; and

(f)    ensure that all decisions were the product of independent business judgment and not the result of outside influences or entrenchment motives.

53.    Each Individual Defendant, by virtue of his or her position as a director and/or officer, owed to the Company and to its shareholders the fiduciary duties of loyalty, good faith, and the exercise of due care and diligence in the management and administration of the affairs of the Company, as well as in the use and preservation of its property and assets.  The conduct of the Individual Defendants complained of herein involves a knowing and culpable violation of their obligations as directors and officers of Anavex, the absence of good faith on their part, and a reckless disregard for their duties to the Company and its shareholders that the Individual Defendants were aware, or should have been aware, posed a risk of serious injury to the Company.

54.    The Individual Defendants breached their duties of loyalty and good faith by causing the Company to issue false and misleading statements concerning its interrelationship with Primoris, and that Anavex used a paid stock promoter to artificially inflate the Company's share price.  As a result, Anavex has expended, and will continue to expend, significant sums of money related to investigations and lawsuits.

**THE COMPANY'S CORPORATE GOVERNANCE**

55.    The Company's Code of Conduct & Ethics Policy provides in relevant part:

I.    PURPOSE

As a business engaged in the discovery, development and commercialization of medicines for the treatment of various

11

diseases, Anavex™ Life Sciences Corp. (the "Corporation") must always act in a way that reflects the highest standards of corporate behavior.

Since the behavior of a corporation is the sum of the behavior of its directors, officers and employees, the Policy on Business Code of Conduct and Ethics (the "Policy") defines what is expected of each of us as we undertake our business at Anavex Life Sciences Corporation. Each of us must always exercise good judgment and common sense in making the necessary choices to advance the interests of the Corporation. The development and maintenance of relationships of trust between each of us and government officials, health care professionals, patients, suppliers, customers, investors and other employees is essential and expected.

\*    \*    \*

## II.    RESPONSIBILITIES

All directors, officers and employees of the Corporation are responsible for reading, becoming familiar and complying with this Policy. Any director, officer, or employee who observes or otherwise becomes aware of conduct that violates, or could violate, the Policy must take a prompt report of such violation to the Corporation. Any officer or employee who fails to immediately report a Policy violation, or perceived violation, or who violates any aspect of the Policy may be subject to disciplinary action, up to and including termination of employment.

\*    \*    \*

## III.    CONFLICT OF INTEREST

All directors, officers and employees have a duty to avoid business, financial or other direct or indirect relationships which conflict with the interests of the Corporation or which divide his or her loyalty to the Corporation. A conflict of interest occurs when your personal interest interferes or appears to interfere with the interests of the Corporation. A conflict of interest can arise whenever, a director, officer or employee takes action or have an interest that prevents him/her form undertaking his/her Corporation duties honestly, objectively and fairly. It is almost always a conflict for a Corporation officer or employee to work simultaneously for a competitor, customer, or supplier or to work for a competitor as a consultant or board member.

Soliciting or accepting gifts (other than items of nominal value), payments, loans or any form of compensation from suppliers, customers, competitors, or others in return for or seeking to do business with the Corporation is not permitted.

Any activity which even appears to present a conflict must be avoided or terminated unless, after disclosure to the Corporation, it is determined that the activity is not harmful to the Corporation or otherwise improper. It is our responsibility to disclose any material transaction or relationship that could be expected to give rise to a conflict of interest to the CEO or Board of Directors.

\* \* \*

## V.   FAIR DEALING

Directors, officers and employees are expected to deal ethically, fairly and honestly with all government officials as well as with the Corporation's suppliers, customers, competitors and each other. Statements regarding the Corporation's products and services must be true, and not be incomplete, misleading, deceptive or fraudulent. It is impermissible to take unfair advantage of anyone through manipulation, concealment, abuse of privileged information, misrepresentation of material facts or any other such practice.

\* \* \*

## VII.   PROTECTION & USE OF CORPORATE ASSETS

Directors, officers and employees should seek to protect the Corporation's assets and ensure their proper use. Theft, carelessness and waste have a direct impact on the Corporation's profitability. Any suspected incident or fraud or theft must be reported promptly to the supervisor or a member of the legal department. Corporation equipment should only be used for Corporation business.

No Corporation funds or other assets shall be used for any unlawful purpose. No director, officer or employee shall purchase privileges or special benefits through payments or bribes or other illegal payments.

Employees, officers and directors must advance the Corporation's legitimate interests when the opportunity to do so arises. You are prohibited from exploiting for your personal advantage

opportunities that are discovered through your position within the Corporation or the use of Corporation property or information.

Areas that require particular attention to ensure proper compliance include:

- Antitrust and Competition Laws: It is the policy of the corporation to comply with the antitrust and competition laws of each country in which the Corporation does business. No director, officer or employee of the Corporation will engage in anti-competitive conduct in violation of any antitrust or competition law.

- Intellectual Property Laws: The Corporation requires that all scientific and technical information generated, utilized and maintained by its employees and in strict compliance and conformity with applicable intellectual property laws.

- Workplace Safety Laws and Regulations: The Corporation requires full compliance with applicable workplace safety and industrial hygiene standards required by law. Each of us has a responsibility for maintaining a safe and healthy working environment for all persons at the Corporation, following safety and health rules and practices and reporting accidents, injuries and unsafe equipment, practices or conditions.

- Insider Trading Laws: All members of board of directors and of executive boards, and their auxiliary staff in the corporate group, will be severely penalized if they make use of "hot information" (i.e. information that is not available to the general public, facts which could substantially influence the price of a listed security) that is in their possession to create a financial advantage for themselves or for some third party by purchasing (prior to the announcement of favorable information)or selling (prior to the announcement of unfavorable information) stock that is listed on an exchange or other securities. The insider trading provisions affect securities of Anavex Life Sciences Corp., and those of companies that are being acquired or merged with Anavex or a corporation with which Anavex is planning to enter into a strategic alliance, if the said securities are listed on an exchange or traded in pre-market dealings.

Also severe penalties for:

1. All those who do not seek to enrich themselves but solely procure a benefit for someone else;

2. All those who in their capacity as officers or auxiliaries transmit insider information ("hot information") as a tip to other parties, even if this is solely to the benefit of the other party;

3. Insider information should be treated as confidential information which, if it were to become known, would foreseeably have a substantial impact on the price of stocks and other securities of a corporation, or options thereon, which are traded on an exchange or in pre-market dealings.

- These provisions require all employees of the group who acquire or could acquire insider knowledge to be especially vigilant and disciplined concerning their private investments and what they say to others. Employees who invest in securities or who wish to sell securities must desist from purchases and sales that could create advantage as soon as he/she has insider knowledge of "hot information". This is the point in time at which the critical period commences for the employee under the insider trading law. The critical period ends for each employee (and, with this, the obligation not to engage in trading his/her stock and other securities) on the day that the general public acquires knowledge of the "hot information", be it through an official communication made by the corporation or in some other manner. Every employee who has insider knowledge must keep this "hot information" confidential during the critical period up until the facts that could substantially influence securities prices become publicly known.

*    *    *

- Laws and Regulations relating to Records Retention: The Corporation must comply with all laws and regulations mandating specified time periods for retaining various records of Corporation's activities. It is the responsibility of each direct report of the CEO working with his/her staff and the Legal department, to establish and maintain a system for the retention and safekeeping of all records that are required by law or Corporation Policy.

* * *

- Responsibility of Corporation Personnel: Every director, officer, or employee has the responsibility to report a violation or suspected violation of this Policy. The corporation promptly responds to all reports of suspected violations. Any Director, officer, or employee who knows or believe that any other Director, officer, or employee of the Corporation, or anyone else representing the Corporation, is violating or is suspected of violating this Policy should contact your supervisor.

## SUBSTANTIVE ALLEGATIONS

56.     Anavex is a pharmaceutical company engaged in the development of drug candidates to treat Alzheimer's disease and potentially other central nervous system (CNS) diseases.

57.     On November 2, 2007, Avanex announced that it engaged Primoris Group Inc. ("Primoris") to provide investor relations services to the Company.  It also stated that under the terms of its agreement, which commenced November 1, 2007, Primoris would be paid a fee of $5,000 per month.  Primoris was also granted options to purchase 50,000 common shares of the Company exercisable for a period of five years from the date of issuance, at an exercise price of $3.75 per common share.

58.     Upon information and belief, Primoris exercised its options to purchase these shares.

59.     Primoris was founded by Joseph Carusone and Nick Boutsalis in 2001.  Joseph Carusone and Nick Boutsalis continue to work at Primoris to the present.

60.     Joseph Carusone was also an officer of Striker Energy Corp. ("Striker", and also known as PediatRx Inc. and Quint Media Inc.) from approximately May 2009 through June 2014.

61.     Durrant served as a director of Anavex from December 17, 2007 until September

16

16, 2011.  Also, since May 28, 2010, Durrant served in a consulting capacity as President and a director of PediatRx Inc., a wholly owned subsidiary of Striker until it was merged into Striker on December 28, 2011.  Durrant served in various officer capacities for Striker including President and CEO from approximately 2011 to around August 7, 2013.

62.     Tousey served as a director of Anavex from June 3, 2008 until approximately 2011.  Also, since July 1, 2010, Tousley served as the Secretary, Chief Financial Officer and a director of PediatRx Inc., a wholly owned subsidiary of Striker until it was merged into Striker on December 28, 2011.  Tousey served as Secretary, Treasurer, and CFO for Striker from November 17, 2010 to around October 31, 2012.

63.     Plaintiff is informed and believes and thereon alleges that although Anavex did disclose Durrant's and Tousley's relationship with Striker in its various 10-K filings, it *never* disclosed the Anavex/Primoris/Striker interrelationship.

64.     On December 12, 2014, Anavex announced that it was now trading on the OTCQX marketplace under the Company's existing stock ticker AVXL.  Prior to that date, the Company traded through the Over-the-Counter Bulletin Board quotation system.

65.     On October 26, 2015, Anavex announced that it received approval to begin trading its common stock on the NASDAQ Capital Market, and will begin to trade on NASDAQ under the symbol "AVXL" at the opening of market hours on October 28, 2015.

### THE INDIVIDUAL DEFENDANTS ALLOWED
### THE ISSUANCE OF MATERIALLY FALSE AND
### MISLEADING STATEMENTS ISSUED DURING THE PERIOD

66.     On May 17, 2013, Defendants caused the Company to file a quarterly report on Form 10-Q with the SEC announcing the Company's financial and operating results for the quarter and fiscal year ended March 31, 2013 (the "Q2 2013 Form 10-Q").  For the quarter, the

Company reported a net loss of $0.11 million, or zero per diluted share, on zero revenue, compared to a net loss of $0.91 million, or $0.12 per diluted share, on zero revenue for the same period in the prior year.

67.     The Q2 2013 Form 10-Q included a certification signed by Skarpelos pursuant to the Sarbanes Oxley Act of 2002 ("SOX"), stating that the financial information contained in the Q2 2013 Form 10-Q was accurate and disclosed any material changes to the Company's internal control over financial reporting.

68.     On July 8, 2013, Defendants caused the Company to file a Form 8-K with the SEC and issued a press release announcing the closing of $2.6 million in a private placement financing and conversion of liabilities, and an agreement with institutional investor Lincoln Park Capital Fund, LLC ("Lincoln Park Capital") for a funding commitment of up to $10 million with an initial investment of $100,000 (the "July 8, 2013 8-K"). The July 8, 2013 8-K also announced the appointment of defendant Missling as the Company's CEO.

69.     On August 14, 2013, Defendants caused the Company to file a quarterly report on Form 10-Q with the SEC announcing the Company's financial and operating results for the quarter ended June 30, 2013 (the "Q3 2013 Form 10-Q"). For the quarter, the Company reported a net loss of $0.15 million, or $0.04 per diluted share, on zero revenue, compared to a net loss of $4.54 million, or $0.64 per diluted share, on zero revenue for the same period in the prior year.

70.     The Q3 2013 Form 10-Q included a certification signed by Missling pursuant to SOX, stating that the financial information contained in the Q3 2013 Form 10-Q was accurate and disclosed any material changes to the Company's internal control over financial reporting.

71.     On December 30, 2013, Defendants caused the Company to file an annual report on Form 10-K with the SEC announcing the Company's financial and operating results for the

quarter and fiscal year ended September 30, 2013 (the "FY 2013 Form 10-K"). For the quarter, the Company reported a net loss of $2.99 million, or $0.32 per diluted share, on zero revenue, compared to a net loss of $0.67 million, or $0.08 per diluted share, on zero revenue for the same period in the prior year. For fiscal year 2013, the Company reported a net loss of $3.70 million, or $0.48 per diluted share, on zero revenue, compared to a net loss of $8.30 million, or $1.16 per diluted share, on zero revenue for fiscal year 2012.

72.     The FY 2013 10-K included a certification signed by Missling pursuant to SOX, stating that the financial information contained in the FY 2013 10-K was accurate and disclosed any material changes to the Company's internal control over financial reporting.

73.     On February 14, 2014, Defendants caused the Company to file a quarterly report on Form 10-Q with the SEC announcing the Company's financial and operating results for the quarter ended December 31, 2013 (the "Q1 2014 Form 10-Q"). For the quarter, the Company reported net income of $0.36 million, or $0.04 per diluted share, on zero revenue, compared to a net loss of $0.45 million, or $0.04 per diluted share, on zero revenue for the same period in the prior year.

74.     The Q1 2014 Form 10-Q included a certification signed by Missling pursuant to SOX, stating that the financial information contained in the Q1 2014 Form 10-Q was accurate and disclosed any material changes to the Company's internal control over financial reporting.

75.     On May 14, 2014, Defendants caused the Company to file a quarterly report on Form 10-Q with the SEC announcing the Company's financial and operating results for the quarter ended March 31, 2014 (the "Q2 2014 Form 10-Q"). For the quarter, the Company reported a net loss of $1.02 million, or $0.12 per diluted share, on zero revenue, compared to a net loss of $0.11, or zero per diluted share, on zero revenue for the same period in the prior year.

76. The Q2 2014 Form 10-Q included a certification signed by Missling pursuant to SOX, stating that the financial information contained in the Q2 2014 Form 10-Q was accurate and disclosed any material changes to the Company's internal control over financial reporting.

77. On August 13, 2014, Defendants caused the Company to file a quarterly report on Form 10-Q with the SEC announcing the Company's financial and operating results for the quarter ended June 30, 2014 (the "Q3 2014 Form 10-Q"). For the quarter, the Company reported a net loss of $1.01 million, or $0.12 per diluted share, on zero revenue, compared to a net loss of $0.15 million, or $0.04 per diluted share, on zero revenue for the same period in the prior year.

78. The Q3 2014 Form 10-Q included a certification signed by Missling pursuant to SOX, stating that the financial information contained in the Q3 2014 Form 10-Q was accurate and disclosed any material changes to the Company's internal control over financial reporting.

79. On December 29, 2014, Defendants caused the Company to file an annual report on Form 10-K with the SEC announcing the Company's financial and operating results for the quarter and fiscal year ended September 30, 2014 (the "FY 2014 Form 10-K"). For the quarter, the Company reported a net loss of $9.70, or $0.88 per diluted share, on zero revenue, compared to a net loss of $3.70, or $0.32 per diluted share, on zero revenue for the same period in the prior year. For fiscal year 2014, the Company reported a net loss of $11.37 million, or $1.16 per diluted share, on zero revenue, compared to a net loss of $3.70 million, or $0.48 per diluted share, on zero revenue for fiscal year 2013.

80. The FY 2014 Form 10-K included a certification signed by Missling pursuant to SOX, stating that the financial information contained in the FY 2013 Form 10-K was accurate and disclosed any material changes to the Company's internal control over financial reporting.

81. On February 17, 2015, Defendants caused the Company to file a quarterly report

on Form 10-Q with the SEC announcing the Company's financial and operating results for the quarter ended December 31, 2014 (the "Q1 2015 Form 10-Q"). For the quarter, the Company reported a net loss of $0.79 million, or $0.08 per diluted share, on zero revenue, compared to a net loss of $0.36 million, or $0.04 per diluted share, on zero revenue for the same period in the prior year.

82.     The Q1 2015 Form 10-Q included a certification signed pursuant by Missling to SOX, stating that the financial information contained in the Q1 2015 Form 10-Q was accurate and disclosed any material changes to the Company's internal control over financial reporting.

83.     On May 14, 2015, Defendants caused the Company to file a quarterly report on Form 10-Q with the SEC announcing the Company's financial and operating results for the quarter ended March 31, 2015 (the "Q2 2015 Form 10-Q"). For the quarter, the Company reported a net loss of $1.73 million, or $0.12 per diluted share, on zero revenue, compared to a net loss of $1.02 million, or $0.12 per diluted share, on zero revenue for the same period in the prior year.

84.     The Q2 2015 Form 10-Q included a certification signed by Missling pursuant to SOX, stating that the financial information contained in the Q2 2015 Form 10-Q was accurate and disclosed any material changes to the Company's internal control over financial reporting.

85.     On August 14, 2015, Defendants caused the Company to file a quarterly report on Form 10-Q with the SEC announcing the Company's financial and operating results for the quarter ended June 30, 2015 (the "Q3 2015 Form 10-Q"). For the quarter, the Company reported a net loss of $4.24 million, or $0.24 per diluted share, on zero revenue, compared to a net loss of $1.01 million, or $0.12 per diluted share, on zero revenue for the same period in the prior year.

86.     The Q3 2015 Form 10-Q included a certification signed by Missling pursuant to

SOX, stating that the financial information contained in the Q3 2015 Form 10-Q was accurate and disclosed any material changes to the Company's internal control over financial reporting.

87.     The statements referenced in ¶¶ 66-86 were materially false and misleading because Defendants made false and/or misleading statements, as well as failed to disclose material adverse facts about the Company's business, operational and compliance policies. Specifically, Defendants made false and/or misleading statements and/or failed to disclose that: (i) Anavex had used a paid stock promoter to artificially inflate the Company's share price; and (ii) as a result of the foregoing, Anavex's public statements were materially false and misleading at all relevant times.

## DEFENDANTS ENTRENCH THEMSELVES

88.     In order to maintain their positions, compensation and perquisites, Defendants authorized the Company to enter into a transaction with an outside entity known as Lincoln Park Capital, LLC. ("LPC") ("Lincoln") which elevated the interests of Defendants and Lincoln over those of the Company and its ordinary stockholders.  On July 5, 2013, Defendants authorized the Company to enter into a "Purchase Agreement" and a "Registration Rights Agreement" with Lincoln to sell up to $10 million of Company common stock to Lincoln.  At the outset of this agreement (the "Lincoln First Agreement"), Lincoln bought 250,000 shares of Anavex for $100,000 which equated to $0.40 per share.  As part of the Lincoln First Agreement, Lincoln also simultaneously received a commitment fee of another 341,858 shares for free.  Thus, for $100,000, Defendants allowed Lincoln to acquire 591,858 shares of Anavex stock which equated to an average price of $0.169 per share.

89.     In order to maintain their positions, compensation and perquisites, Defendants authorized the Company to include in the Lincoln First Agreement a condition that allowed the

Company to sell a further $9.9 million worth of additional common stock over the next 36 months on terms more advantageous to Lincoln than to other investors and to impose no restrictions on when Lincoln could turn around and sell the Anavex common stock just purchased.   Defendants also agreed to distribute to Lincoln, if all or part of the additional $9.9 million in shares was purchased by Lincoln over the 36 months, a further "commitment fee" of 133,409 additional shares for free.

90.    On July 5, 2013, Defendants authorized the Company to enter into another "Purchase Agreement" and a "Registration Rights Agreement" with Lincoln to sell up to $50 million of Company common stock to Lincoln.  At the outset of this agreement (the "Lincoln Second Agreement"), Lincoln bought 0 shares of Anavex and parted with no money.  Instead, Defendants allowed Lincoln to receive a "commitment fee" of another 179,598 shares for free and an additional 89,799 shares as a further "commitment fee," *pro rata*, if and when Lincoln purchase some or all of the $50 million in shares set aside by defendants for it.

91.    Moreover, in the Lincoln Second Agreement, Defendants permitted Anavex to agree that Lincoln's purchase price would be calculated as the lesser of: (i) the lowest sale price the Company's common stock traded on that purchase date or (ii) the arithmetic average of the three lowest closing sale prices for the Company's common stock during the ten consecutive trading days ending on the trading day immediately preceding that purchase date.  In return, Defendants agreed that Lincoln did not have to hold the purchased Anavex shares for even one minute, but was free to resell them immediately.  Thus, on each purchase date Lincoln was afforded by Defendants a built-in profit to purchase and immediately flip Anavex common stock to purchasers in the market and Lincoln could use the free shares it received as part of the "commitment fee" to arbitrage the shares it would purchase from Anavex and then sell.

92.     Thus, Defendants contrived to retain their positions of power, and to avoid having to have the Company attempt to sell common stock directly to the public. Defendants did this because they knew that if they attempted to sell common stock directly to the public, their mismanagement and manipulation of the Company to enrich themselves would be scrutinized and exposed.

93.     Under the Lincoln Second Agreement, Defendants can thus require the Company to force Lincoln to purchase shares repeatedly. Because the sale price is based on the lowest average market price the Company stock reaches, the higher the price at which Anavex's shares trades, the more money Defendants can bring in to entrench their positions. And, because the sale price to Lincoln is based on the lowest average price, Lincoln profits from being the conduit selling the common stock of the Company for the benefit of Defendants and itself at terms not available to the other shareholders of the Company.

94.     Thus, Defendants had a strong incentive to cause the Company to inflate its share price.

**THE BREACH OF FIDUCIARY DUTY BEGINS TO BE REVEALED**

95.     On November 11, 2015, Jean Fonteneau (on *seekingalpha.com*) published an article entitled "Anavex Life Sciences: A Promotional Company with Too Many Red Flags". Referencing the heavy promotional and PR activity triggering a stock price run-up, and other red flags, the article states in part:

> The case of Anavex Life Sciences: AVXL made its debut as a publicly traded company in 2006 via a reverse merger, trading on the loosely regulated OTC market where the reporting requirements are very limited . . . .
>
> This debut was accompanied by a fanfare of promotional press releases. For instance, in early 2007, Anavex was announcing in a PR "*its strategic vision for growth by discovering and developing*

24

*cutting-edge drugs against neurological diseases"* and shortly after, in another PR, *"its strategic vision for growth by discovering and developing cutting-edge drugs against solid tumors".* All the while the stock was heavily promoted.

\*   \*   \*

The stock was the subject of another round of heavy promotion in 2009-2010. In this 2009 presentation, Anavex claimed once again to have a diversified pipeline of drugs under development and to potentially generate $60 billion of yearly revenues by 2020 (yes billions…)

None of this ever came to pass, but in the meantime, as a result of the constant PR and promotional activity, the stock enjoyed 2 episodes of steep price appreciation that allowed for various financing schemes to be arranged and stocks to be sold during the run ups that were inevitably followed by steep stock price declines.

\*   \*   \*

One thing that has never changed over the years for Anavex, since 2007, and over the different episodes of promotional activities, is the presence of the same investor relations/PR firm based in Canada, Primoris Group (a firm whose direct phone number in Toronto appears on every Anavex PR since 2007 to today).

\*   \*   \*

From 2006 until 2013, while it is unclear if and when any real drug development seemed to have taken place, Anavex always kept with its habit of regularly releasing PR updates, but the stock kept drifting lower and lower until the Spring of 2013, when a new episode of paid promotional activity seemed to have taken place as exhibited by ***this notice from the British Columbia Securities Commission*** circulated after it had ordered the suspension of trading in Anavex's shares following unusual activity and reports of paid promotions . . . .

Coincidentally(?) and shortly thereafter, in July 2013, a new financing arrangement, taking advantage of the recent run-up in the stock price created by the paid promotional activity, was announced to the tune of $10 million with an entity called Lincoln Park Capital (more on that later) and a new CEO was appointed. It seemed like a new era was starting for the company, and the frequency of press releases and promotional activity picked up again, with now a more narrow focus on Alzheimer's disease. At the time, the company seemed to have only one full-time employee, the new CEO.

25

At the end of 2014, another "financing" with Lincoln Park Capital was announced (in that announcement, Lincoln Park was described as a "long time investor" in Anavex), and shortly after, the news that an actual trial for the uses of one of the Anavex compound (Anavex 2-73) in the treatment of Alzheimer's disease was going to take place was released.

***This was the start of a steep year-long run-up in AVXL's stock price; the stock climbing from about $0.65 in late 2014 to more than $14 during the week of November 2nd, 2015.*** In late October 2015, AVXL even managed to get itself up listed from the OTC exchange to the Nasdaq, giving more credibility to the story and participating in boosting the stock price. [Emphasis added].

96.     On December 29, 2015, Defendants caused the Company to file its Form 10-K annual report with the SEC announcing the Company's financial and operating results for the quarter and fiscal year ended September 30, 2015 (the "FY 2015 Form 10-K"). For the quarter, the Company reported a net loss of $5.36 million, or $0.20 per diluted share, on zero revenue, compared to a net loss of $9.70 million, or $0.88 per diluted share, on zero revenue for the same period in the prior year. For fiscal year 2015, the Company reported a net loss of $12.11 million, or $0.65 per diluted share, on zero revenue, compared to a net loss of $11.37 million, or $1.16 per diluted share, on zero revenue for fiscal year 2014.

97.     In the FY 2015 Form 10-K, the Company also disclosed that it had received a subpoena from the SEC on December 22, 2015. FY 2015 Form 10-K stated in relevant part that "[t]he Company believes the subpoena and investigation relate to the recent unusual activity in the market for the Company's shares."

98.     On December 29, 2015 and as a result of this news, Anavex stock fell $0.72, or 10.24%, to close at $6.31.

99.     The FY 2015 Form 10-K included a certification signed by Missling and Boenisch pursuant to SOX, stating that the financial information contained in the FY 2013 Form

10-K was accurate and disclosed any material changes to the Company's internal control over financial reporting.

100.    On December 30, 2015, Melissa Davis (on *seekingalpha.com*) published an article entitled "Anavex: A Regulatory Target Damaged By Incriminating Evidence." Referencing the SEC formal investigation, the article stated in relevant part:

> Since its early days as a young penny-stock company, for example, Anavex has relied on The Primoris Group for publicity in spite of the firm's crowded roster of dubious microcap companies and its suspected involvement in pump-and-dump schemes.
>
> By the time that Anavex hired the firm almost a decade ago - using 50,000 stock options to help cover the bill - Primoris had already developed a reputation for touting the very sort of sleazy microcap stocks responsible for giving the industry such a horrible name . . .
>
> .
>
> *   *   *
>
> With Primoris in charge of its publicity, Anavex has managed to generate some rather powerful hype of its own.
>
> Anavex owes at least some of its newfound popularity to the glowing reviews published by Kanak Kanti De, a so-called "doctor" who has developed a strong following on financial websites like *Seeking Alpha* and *The Motley Fool* (where he ranks as a senior healthcare contributor) by portraying himself as "a retired medical practitioner" with an impressive "M.D." behind his name. Unless De rushed to pursue a second career in medicine after serving as the chairman of IndoGenic Consultancy -- a paid content provider that caters to clients seeking favorable stock coverage -- however, his credentials look somewhat inflated, to say the very least. In the official bio that appeared on its website less than five years ago, IndoGenic described De as "a veteran college principal (retired) with a Ph.D. in English" -- not a medical doctor -- when the firm openly showcased his role as the chairman of its board.

101.    On December 30, 2015 and based on this article Anavex stock dropped $0.78, or 12.42% to close at $5.50.

## DAMAGES TO ANAVEX

102.     Plaintiff, derivatively on behalf of Anavex, seeks relief for the damage sustained, and to be sustained, by Anavex as a result of the Individual Defendants' breaches of their fiduciary duties and knowing and/or reckless behavior.  The Individual Defendants' breaches of their fiduciary duties have proximately caused, and will continue to cause, Anavex to suffer substantial monetary damages as a result of the wrongdoing herein, including, among other things:

(a)     damage to Anavex's reputation and good will (including perhaps irreparable damage to Anavex's reputation and credibility with insurance and securities regulators, and to Anavex's reputation and credibility in the business, insurance, and financial communities);

(b)     resultant loss of business and business opportunities;

(c)     increased costs of capital;

(d)     a huge loss in market value and shareholder equity;

(e)     the costs of internal investigations, including the costs of investigations conducted by outside auditors and outside counsel; and

(f)     legal fees, costs, and potentially huge amounts payable in settlement or satisfaction of lawsuits alleging violations of the federal securities laws.

Anavex has been directly and substantially injured by reason of the Individual Defendants' intentional breach and/or reckless disregard of their fiduciary duties to the Company.  Plaintiff, as a shareholder and representative of Anavex, seeks damages and other relief for the Company, in an amount to be proven at trial.

## DERIVATIVE AND DEMAND FUTILITY ALLEGATIONS

103.     Plaintiff brings this action derivatively in the right and for the benefit of the Company to redress injuries suffered and to be suffered as a direct and proximate result of the

28

breaches of fiduciary duties and gross mismanagement by the Individual Defendants.

104.   Plaintiff will adequately and fairly represent the interests of the Company and its shareholders in enforcing and prosecuting its rights and has retained counsel competent and experienced in derivative litigation.

105.   Plaintiff is a current owner of the Company stock and has continuously been an owner of Company stock during all times relevant to the Individual Defendants' wrongful course of conduct alleged herein.   Plaintiff understands his obligation to hold stock throughout the duration of this action and is prepared to do so.

106.   During the illegal and wrongful course of conduct at the Company and through the present, the Board consisted of the Individual Defendants.   Because of the facts set forth throughout this Complaint, demand on the Company Board to institute this action is not necessary because such a demand would have been a futile and useless act.

107.   The Company Board is currently comprised of five (5) members – Defendants Missling, Skarpelos, Metzner, Favus, and Thomas.   Thus, Plaintiff is required to show that a majority of the Defendants, *i.e.*, three (3), cannot exercise independent objective judgment about whether to bring this action or whether to vigorously prosecute this action.

108.   Defendants Missling, Skarpelos, Metzner, Favus, and Thomas face a substantial likelihood of liability in this action because they caused the Company to issue false and misleading statements concerning its financial results and future prospects.   Because of their advisory, executive, managerial, and directorial positions with the Company, Defendants Missling, Skarpelos, Metzner, Favus, and Thomas had knowledge of material non-public information regarding the Company and was directly involved in the operations of the Company at the highest levels.

109.    Defendants Missling, Skarpelos, Metzner, Favus, and Thomas either knew or should have known of the false and misleading statements that were issued on the Company's behalf and took no steps in a good faith effort to prevent or remedy that situation.

110.    The Individual Defendants (or at the very least a majority of them) cannot exercise independent objective judgment about whether to bring this action or whether to vigorously prosecute this action.  For the reasons that follow, and for reasons detailed elsewhere in this complaint, Plaintiff has not made (and should be excused from making) a pre-filing demand on the Board to initiate this action because making a demand would be a futile and useless act.

111.    Defendants Missling, Skarpelos, Metzner, Favus, and Thomas approved and/or permitted the wrongs alleged herein to have occurred and participated in efforts to conceal or disguise those wrongs from the Company's stockholders or recklessly and/or with gross negligence disregarded the wrongs complained of herein, and are therefore not disinterested parties.

112.    Defendants Missling, Skarpelos, Metzner, Favus, and Thomas authorized and/or permitted the false statements to be disseminated directly to the public and made available and distributed to shareholders, authorized and/or permitted the issuance of various false and misleading statements, and are principal beneficiaries of the wrongdoing alleged herein, and thus, could not fairly and fully prosecute such a suit even if they instituted it.

113.    Further, because of their participation in the gross dereliction of fiduciary duties, and breaches of the duties of due care, good faith, and loyalty, Defendants Missling and Skarpelos are unable to comply with their fiduciary duties and prosecute this action.  They are in a position of irreconcilable conflict of interest in terms of the prosecution of this action and

defending themselves in the securities fraud class action lawsuit brought under the Securities Exchange Act of 1934.

114.    Additionally, each of the Individual Defendants received payments, benefits, stock options, and other emoluments by virtue of their membership on the Board and their control of the Company.

115.    Missling is not disinterested or independent, and therefore, is incapable of considering demand because Missling (as July 5, 2013) is an employee of the Company who derives substantially all of his income from his employment with Anavex, making him not independent.  As such, Defendant Missling cannot independently consider any demand to sue himself for breaching his fiduciary duties to Anavex, because that would expose him to liability and threaten his livelihood.

116.    Additionally, Anavex acknowledges that Missling is not independent in its DEF 14A.

117.    Defendant Missling owns 1,701,167 shares (4.7% of the beneficially owned shares) of Company stock.  Where, as here, the controlling shareholder is a named defendant, demand futility is presumed.  *Abbe v. Goss*, 411 F. Supp. 923, 924-25 (S.D.N.Y.1975) (demand on directors excused where three defendants owned 44% of the outstanding shares); *In re Penn Central Sec. Litig.*, 367 F. Supp. 1158, 1164-65 (E.D. Pa. 1973) (demand on directors excused where one defendant owned 80% of outstanding shares) *Clark v. Lomas & Nettleton Fin. Corp.*, 625 F.2d 49, 53 (5th Cir. 1980) ("Where, as here, the controlling shareholders are named defendants, demand "futility" is presumed.").

118.    Further, Missling faces a sufficiently substantial likelihood of liability in the securities class action.

119. This lack of independence and financial benefits received by Missling renders him incapable of impartially considering a demand to commence and vigorously prosecute this action.

120. Additionally, Anavex acknowledges that Skarpelos is not independent in its DEF 14A.

121. Further, Skarpelos faces a sufficiently substantial likelihood of liability in the securities class action.

122. This lack of independence and financial benefits received by Skarpelos renders him incapable of impartially considering a demand to commence and vigorously prosecute this action.

123. Each of these Individual Defendants are not disinterested because a substantial portion of their livelihood depends on receiving payments from Anavex and not bringing their fellow directors and officers to justice.

## FIRST CAUSE OF ACTION

### Against Defendants for Breach of Fiduciary Duties

124. Plaintiff incorporates by reference and re-alleges each and every allegation contained above, as though fully set forth herein.

125. The Individual Defendants owe the Company fiduciary obligations. By reason of their fiduciary relationships, the Individual Defendants owed and owe the Company the highest obligation of good faith, fair dealing, loyalty, and due care.

126. The Individual Defendants violated and breached their fiduciary duties of care, loyalty, reasonable inquiry, and good faith.

127. The Individual Defendants engaged in a sustained and systematic failure to

properly exercise their fiduciary duties.  Among other things, the Individual Defendants breached their fiduciary duties of loyalty and good faith by allowing the Company to improperly misrepresent the Company's publicly reported financials.  These actions could not have been a good faith exercise of prudent business judgment to protect and promote the Company's corporate interests.

128.   As a direct and proximate result of the Individual Defendants' failure to perform their fiduciary obligations, the Company has sustained significant damages.  As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company.

129.   As a direct and proximate result of the Individual Defendants' breach of their fiduciary duties, the Company has suffered damage, not only monetarily, but also to its corporate image and goodwill.  Such damage includes, among other things, costs associated with defending securities lawsuits, severe damage to the share price of the Company, resulting in an increased cost of capital, the waste of corporate assets, and reputational harm.

## SECOND CAUSE OF ACTION

### Against Defendants for Gross Mismanagement

130.   Plaintiff incorporate by reference and re-alleges each allegation contained above, as though fully set forth herein.

131.   By their actions alleged herein, the Individual Defendants, either directly or through aiding and abetting, abandoned and abdicated their responsibilities and fiduciary duties with regard to prudently managing the assets and business of the Company in a manner consistent with the operations of a publicly held corporation.

132.   As a direct and proximate result of the Individual Defendants' gross mismanagement and breaches of duty alleged herein, the Company has sustained significant damages in excess of millions of dollars.

133.   Because of the misconduct and breaches of duty alleged herein, the Individual Defendants are liable to the Company.

### THIRD CAUSE OF ACTION

#### Against Defendants for Breach of Fiduciary Duty for Failure to Maintain Adequate Oversight

134.   Plaintiff incorporates by reference all the preceding and subsequent paragraphs as if fully set forth herein.

135.   The Individual Defendants owed and owe the Company and its shareholders fiduciary obligations of good faith, fair dealing, loyalty and due care.

136.   The Individual Defendants, and each of them, violated and breached their fiduciary duties of care, loyalty, reasonable inquiry, oversight, good faith and supervision. As alleged herein, the Individual Defendants have failed to implement adequate internal controls to ensure implement policies and controls to ensure the dissemination of accurate information to the Company's shareholders and the broader investment community.   As a direct and proximate result of the Individual Defendants' failure to perform their fiduciary obligations, the Company has sustained significant damages, not only monetary, but also to its corporate image and goodwill.

137.   As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company.

138.   Plaintiff, on behalf of the Company, has no adequate remedy at law.

### FOURTH CAUSE OF ACTION

#### Against Defendants for Abuse of Control

139.   Plaintiff incorporates by reference all the preceding and subsequent paragraphs as if fully set forth herein.

140.   The Individual Defendants' misconduct alleged herein constituted an abuse of

their ability to control and influence the Company, for which they are legally responsible.  In particular, the Individual Defendants abused their positions of authority by failing to implement internal controls necessary to the proper running of the Board in the interests of all the Company's shareholders.

141.    As a direct and proximate result of the Individual Defendants' abuse of control, as a result of the misconduct alleged herein, the Individual Defendants are liable to the Company.

142.    Plaintiff, on behalf of the Company, has no adequate remedy at law.

## FIFTH CAUSE OF ACTION

### Direct Claim Against Defendants for Gross Mismanagement

143.    Plaintiff incorporates by reference and re-alleges each allegation contained above, as though fully set forth herein.

144.    By their actions alleged herein, Defendants, either directly or through aiding and abetting, abandoned and abdicated their responsibilities and fiduciary duties with regard to prudently managing the assets and business of the Company in a manner consistent with the operations of a publicly held corporation.

145.    As a direct and proximate result of Defendants' gross mismanagement and breaches of duty alleged herein, the value of Plaintiff's ownership interest in the Company has been diminished.

146.    Because of the misconduct and breaches of duty alleged herein, Defendants are liable to the Plaintiff.

## SIXTH CAUSE OF ACTION

### Direct Claim Against Defendants for Unjust Enrichment

147.    Plaintiff incorporates by reference and re-alleges each and every allegation set

forth above, as though fully set forth herein.

148.    By their wrongful acts and the omissions of material fact that they caused to be made, Defendants were unjustly enriched at the expense of, and to the detriment of, the other shareholders of the Company.

149.    Defendants either received bonuses, stock options, or similar compensation from the Company that was tied to the financial performance or artificially inflated valuation of the Company or received compensation that was unjust in light of Defendants' bad faith conduct and thereby diminished the assets of the Company and the value of Plaintiff's ownership interest in the Company

150.    Plaintiff, as a stockholders and representative of the Company, seeks restitution from Defendants and seek an order from this Court disgorging all profits, benefits, and other compensation, including any performance-based or valuation-based compensation, obtained by Defendants due to their wrongful conduct and breach of their fiduciary duties.

### SEVENTH CAUSE OF ACTION

#### Direct Claim for Breach of Fiduciary Duty Against Defendant Missling

151.    Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

152.    Defendant Missling, as Avanex's Chief Executive Officer, owes the Company and his fellow shareholders such as Plaintiff the utmost fiduciary duties of care and loyalty.  By virtue of his position as Chief Executive Officer, Missling was required to: (a) use his ability to manage Anavex in a fair, just, and equitable manner, and (b) act in furtherance of the best interests of Anavex and all of its stockholders.

153.    Missling breached his fiduciary duties by, among other things: (i) being directly

involved in the use of outside paid entities to falsely promote the stock in order to artificially raise the price of the stock; and (ii) consummating the transaction with Lincoln at the expense of the Company and his fellow shareholders.

154.   As a consequence of Missling's breaches of fiduciary duty, the Company's stockholders, including Plaintiff, have been harmed.

**REQUEST FOR RELIEF**

**WHEREFORE**, Plaintiff demands judgment as follows:

A.   Determining that this action is a proper derivative action maintainable under law, and that demand is excused;

B.   Awarding, against all Defendants and in favor of the Company, the damages sustained by the Company as a result of Defendants' breaches of their fiduciary duties;

C.   Directing the Company to take all necessary actions to reform and improve its corporate governance and internal procedures, to comply with the Company's existing governance obligations and all applicable laws and to protect the Company and its investors from a recurrence of the damaging events described herein;

D.   Awarding to Plaintiff directly her damages and the costs and disbursements of the action, including reasonable attorneys' fees, accountants' and experts' fees, costs, and expenses; and

E.   Granting such other and further relief as the Court deems just and proper.

**JURY DEMAND**

Plaintiff demands a trial by jury on all issues so triable.

Dated: March 18, 2016

GAINEY McKENNA & EGLESTON

By: _Thomas J. McKenna_

Thomas J. McKenna
Gregory M. Egleston
440 Park Avenue South, 5th Floor
New York, NY 10016
Tel:    (212) 983-1300
Fax:    (212) 983-0383
Email: tjmckenna@gme-law.com
Email: gegleston@gme-law.com

*Counsel for Plaintiff*